TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY, Plaintiff,

v.

Jo R. MILES, Individually and as Executrix of the Estate of Laurence G. Miles, Defendant.

No. CIV.A.1:01CV2514WBH.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 17, 2003.

H. Sanders Carter, Jr., Kenton Jones Coppage, Carter & Ansley, Atlanta, GA, for Plaintiff.

Robert Roy Ezor, Ezor & Olens, Kenneth Behrman, Kresses Benda Lenner & Schatten, Atlanta, GA, for Defendant.

## ORDER

HUNT, District Judge.

Before the Court is Plaintiff's Motion for Summary Judgment [22]. For the reasons set forth below, this motion is GRANTED.

## BACKGROUND

On September 20, 2001, Transamerica Occidental Life Insurance Company ("Transamerica") brought this declaratory judgment action against Defendant Jo R. Miles ("Mrs.Miles"). This action arises out of a claim by Mrs. Miles to recover $1 million in death benefits under a policy of term life insurance issued by Transamerica to her late husband, Dr. Laurence G. Miles. Transamerica seeks a declaration that Policy No. 41662599 was not in force at the time of Dr. Miles' death, or, if the policy was otherwise in effect, it should be declared void *ab initio* because of misrepresentations in Dr. Miles' application. Mrs. Miles filed a counterclaim to recover benefits under Policy No. 41662599, or, if the Court finds that the policy was extinguished by an accord and satisfaction, she asserts a claim for fraud.

As this case is before the Court on Transamerica's motion for summary judgment, the Court must view the facts in the light most favorable to Mrs. Miles, the non-movant. *See Hairston v. Gainesville*

*Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993). Viewed in this light, the following facts emerge:

### The Transamerica Policies

In 1996, Dr. Miles, an emergency room physician, met with Alan Dinerman, an insurance agent, and completed an application for a $1 million term life insurance policy with Transamerica. The application was approved, and Transamerica issued Policy No. 41219058 ("the original policy") to Dr. Miles. On July 30, 1999, Dr. Miles met with Dinerman to discuss replacing the policy with another $1 million term life insurance policy at a lower premium. Dinerman completed applications for three different insurance companies, including Transamerica. Dinerman submitted the application to Transamerica through W.S. Jones & Associates ("W.S.Jones"), a brokerage firm.

The Transamerica application signed by Dr. Miles consisted of two parts. Part 1 of the application, which was signed and dated July 30, 1999, asked in Question 11 whether any insurance might be discontinued or changed if the insurance applied for was issued. Dr. Miles checked the "yes" box and included the following explanation: "Replacing Transamerica policy # 41219058 for 1,000,000." Plaintiff's Ex. 2. Part 2 of the application, entitled "Paramedical Health History," was completed and signed on August 11, 1999. Dr. Miles represented that within the past five years, he had not had "an X-ray, electrocardiogram or any laboratory test or study;" had not been observed or treated "at a clinic, hospital or sanitarium;" had not been "treated by any physician or practitioner" other than a chiropractor; and had never been told that he had a "disease or abnormality of the ... kidneys" or "cancer or tumor." Plaintiff's Ex. 3.

On August 31, 1999, Transamerica approved Dr. Miles' application and notified W.S. Jones of the approval. On or about September 13, 1999, Transamerica issued Policy No. 41662599 ("the September 13 policy" or "the replacement policy"). *See* Plaintiff's Ex. 4. Transamerica forwarded the policy to W.S. Jones, who in turn forwarded the policy to Dinerman in mid-September with instructions to obtain a premium check before delivering the policy. The Life Policy Invoice from Transamerica provided that the policy had to be delivered by November 12, 1999, but there were no other special delivery instructions. Dr. Miles chose Transamerica over the other two insurance companies that had approved him, but Dinerman delayed delivery of the policy until he received approval for Mrs. Miles' application. On October 5, 1999, Mrs. Miles picked up Dr. Miles' policy and paid the annual premium of $1,600.[1]

According to Mrs. Miles, she had notified Dinerman at some point in August 1999 that her husband did not want to replace his original $1 million policy, but instead wanted to obtain an additional $1 million policy. Dinerman, who maintains that he first learned of a possible change around October 4, did not communicate this request to W.S. Jones until October 7, 1999. On October 13, W.S. Jones received Dr. Miles' premium check and forwarded it to Transamerica with the following instructions: "Get the original policy inforce and count this as new business." Plaintiff's Ex. 6.

On October 18, 1999, Transamerica issued another $1 million term life insurance policy bearing Policy No. 41662599 ("the

---

1. Dinerman testified that Mrs. Miles did not pick up the policy and pay the premium until October 11, 1999. *See* Dinerman Depo., pp. 47–48.

October 18 policy" or "the additional policy"). *See* Plaintiff's Ex. 7. Transamerica forwarded the policy to W.S. Jones on October 20, along with a Life Policy Invoice stating that a "Signed Amendment—APE 2185" was a delivery requirement. Plaintiff's Ex. 9. APE 2185, the Application Amendment, provided as follows: "The Application for Policy No. 41662599 is amended as follows: Question 11 Part 1: No. No replacement of Transamerica 41219058." The Application Amendment also required Dr. Miles to state whether he had "had a change in health due to injury or sickness" or had "consulted, been examined, or been treated by any physician or practitioner" since the date of the application for the policy. Plaintiff's Ex. 1, ¶ 11. On the same day, W.S. Jones instructed Dinerman to have Dr. Miles complete and sign the Application Amendment form.

The following day, October 21, 1999, Dinerman learned from an attorney for Dr. and Mrs. Miles that Dr. Miles had been diagnosed with cancer, and he immediately informed W.S. Jones. On October 22, W.S. Jones advised Dinerman that Transamerica would not honor the additional policy because of Dr. Miles' change in health. Dinerman communicated that information to the Miles' attorney. Dr. Miles never signed the Application Amendment, and the additional policy was never delivered to him.

### Change in Dr. Miles' Health

In late September 1999, Dr. Miles experienced rib pain after lifting weights at a health club. The following day, Dr. Miles had a radiologist at his hospital perform a fluoroscopy of the ribs. No fracture was revealed, but Dr. Miles continued to experience rib pain. A couple of days later, still in September, an X-ray of Dr. Miles' ribs revealed a hairline fracture. On October 1, 1999, having begun to feel fatigued and queasy, Dr. Miles performed a blood test on himself. The blood test revealed an elevated creatinine level, which is evidence of renal insufficiency. On the same day, Dr. Miles saw Dr. Daniel Cohen, a nephrologist. In his notes, Dr. Cohen wrote "? myeloma" as a possible diagnosis. *See* Cohen Depo., Plaintiff's Ex. 3.[2] On October 4, Dr. Cohen performed additional lab work. Dr. Miles' urine test revealed an elevated serum creatinine level, which is evidence of renal insufficiency, and an elevated urine protein level, which is indicative of a kidney problem and suggestive of myeloma. The blood test results were also suggestive of myeloma.

On October 6, 1999, a bone survey was performed on Dr. Miles. Mrs. Miles testified that the radiologist told Dr. Miles that there was no evidence of a pathological fracture; however, the physician's report dictated on the same date stated: "Single rib fracture in the posterior rib with an underlying lytic abnormality which suggests a pathologic fracture [and] Trabecular abnormality in the left ischium which is non-specific but may represent another myelomatous lesion." Plaintiff's Ex. 10, pp. COH 026–27. Dr. Miles returned to Dr. Cohen on October 7. Dr. Cohen noted that Dr. Miles was suffering from renal insufficiency, light chains in the serum, and a pathological rib fracture. Dr. Cohen also noted that Dr. Miles was "aware that his findings are very suggestive of myeloma or light chain disease," and Dr. Miles would be seeing Dr. Lesesne, a hematolo-

---

**2.** Dr. Cohen's written evaluation included the following assessment:

(1) New onset renal insufficiency with history of significant nonsteroidal use, possibly ATN, interstitial nephritis. The sediment seems more consistent with ATN. (2) Mild anemia, mild thrombocytopenia. (3) Rib fracture sustained with flexion, cannot exclude pathological fracture.

Cohen Depo., Plaintiff's Ex. 2.

gist/oncologist that afternoon. Plaintiff's Ex. 10, p. COH 025. Dr. Lesesne diagnosed "probable plasma cell disorder" and discussed treatment of the myeloma with Dr. Miles and his wife. A bone marrow biopsy performed on October 13, 1999 confirmed that Dr. Miles was suffering from multiple myeloma.

### Coverage Dispute

On November 8, 1999, David Costanza, Manager of the Underwriting and Issue Department at Transamerica, sent a letter to Dr. Miles stating Transamerica's position that neither the September 13 policy nor the October 18 policy constituted a binding contract. Costanza enclosed a $1,600 check which represented a refund of the premium.[3] On November 13, 1999, Dr. Miles returned the premium refund check and maintained that the September 13 policy which had been delivered to Mrs. Miles was a valid contract. On December 16, 1999, Tony Aranda, Claims Administrator in the Life Claims Department at Transamerica, sent a letter to Dr. Miles returning the initial premium pending an investigation into the "facts surrounding Policy No. 41662599." Plaintiff's Ex. 15. On December 22, 1999, Dr. Miles again returned the premium refund check to Transamerica, maintaining that there was a binding contract evidenced by his cancelled premium payment check and delivery of the September 13 policy.

Seven months later, on July 24, 2000, Mrs. Miles composed a letter for her husband's signature which demanded the immediate refund of his $1,600 premium payment. After discussing the letter with Dr. Miles, Mrs. Miles signed his name to the letter and sent it to Transamerica.[4] On August 14, 2000, Transamerica issued a check refunding Dr. Miles' premium payment, plus interest. The refund check bore the following notation: "Replmnt refund check, Laurence G. Miles # 41662599." Mrs. Miles signed Dr. Miles' name to endorse the check. The check was negotiated on August 18, 2000. *See* Plaintiff's Ex. 17.

On April 26, 2001, Dr. Miles died of multiple myeloma. On April 30, 2001, Ms. Miles submitted a claim for death benefits under Dr. Miles' original policy. On May 7, Transamerica paid benefits to Mrs. Miles under the original policy in the amount of $1 million, plus interest. On July 2 and August 16, 2001, Mrs. Miles demanded payment of an additional $1 million death benefit under the September 13 policy. This declaratory judgment action followed.

---

**3.** The letter provided, in relevant part:

> On August 19, 1999, we received an application for insurance coverage on your life. The application indicated the new policy was to replace existing Transamerica policy # 41219058. Subsequently, we were notified you had requested we issue the new policy as additional coverage, and that the existing policy remain in force.
>
> As part of the delivery requirements for the new policy # 41662599, we needed an amendment to the original application indicating no replacement of existing coverage and a statement of continued good health. Your representative has informed us that you were recently diagnosed with cancer. Due to the change in your health, we are unfortunately unable to issue the additional coverage.
>
> A refund of the premium deposit payment of $1,600.00 made with the request for additional coverage is enclosed. Policy # 41219058 remains inforce and premiums are paid through to January 01, 2000.

Plaintiff's Ex. 13.

**4.** The letter stated, in relevant part:

> Congratulations! You have successfully screwed my family out of their rightful $1,000,000.00 benefit. Immediately refund my $1600.00 ... premium payment plus interest accrued from August 24, 1999.

Plaintiff's Ex. 16.

## DISCUSSION

### I. Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fairminded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

### II. Transamerica's Motion for Summary Judgment

Transamerica asserts that it is entitled to summary judgment on the following grounds: (1) Policy No. 41662599 never became effective; (2) Policy No. 41662599 was not in force at the time of Dr. Miles' death because there had been an accord and satisfaction; and (3) Policy No. 41662599 should be declared void *ab initio* because of misrepresentations in Dr. Miles' application. As discussed below, the Court concludes that Transamerica is entitled to summary judgment because Policy No. 41662599 never became effective.

### A. Conditions Precedent[5]

■■■ Part 1 of the Transamerica application, as signed by Dr. Miles and made part of Policy No. 41662599, provides, in relevant part:

[A]ny policy issued on this Application shall not take effect until after all of the following conditions have been met: (a) The full first premium is paid, (b) *The Owner has personally received the policy* during the lifetime of and while the Proposed Insured is *in good health,* and (c) All of the statements and answers given in this Application to the best of my belief must be true and complete *as of the date of Owner's personal receipt of the policy* and that the policy will not take effect if the facts have changed.

5. Mrs. Miles contends that the conditions in the application are conditions precedent to contract liability, not contract formation as asserted by Transamerica. The Georgia Supreme Court has held that "a statement of conditions that must be met before the 'policy will be effective' does not determine whether the parties entered into a contract. Rather, [the insurance contract] is consummated upon the unconditional written acceptance of the application." *Southwestern Life v. Middle Georgia Neurological Specialists,* 262 Ga. 273, 275, 416 S.E.2d 496 (1992). Even if, as Mrs. Miles suggests, the conditions contained in the Transamerica application were not barriers to contract formation, all three conditions must still have been satisfied for Mrs. Miles to recover under the policy. *See id.* at 275–76, 416 S.E.2d 496 (explaining that an insurance company may validly define conditions precedent to liability, and those conditions will be enforced as long as there are no conflicting provisions in the policy).

Plaintiff's Ex. 2, p. TRA APP 057 (emphasis added).

Transamerica contends that Policy No. 41662599 never took effect because its acceptance of Dr. Miles' application was conditioned on three events, only one of which occurred. Transamerica contends that the second condition was not met because Dr. Miles was not in good health on or before October 5, 1999, the date that Mrs. Miles picked up the policy and paid the premium. According to Dr. Miles' medical records and the testimony of Dr. Cohen and Mrs. Miles, Dr. Miles had sustained a fractured rib, he was fatigued and queasy, his serum creatinine and urine protein levels were elevated, and he had a serum "monoclonal free lambda light chain," which was suggestive of myeloma. Additionally, Transamerica asserts that as of October 5, Dr. Miles' negative responses in Part 2 of the application were no longer true. By this time, Dr. Miles had undergone several diagnostic tests and had been told by a nephrologist that he had an abnormality of the kidneys.

■ Mrs. Miles does not dispute that Dr. Miles already had manifestations of multiple myeloma before October 5, 1999 and was no longer in "good health" under the terms of the policy. Rather, Mrs. Miles contends that the Court should apply a constructive delivery theory and find that the policy was delivered to Dr. Miles when Dinerman received it in mid-September, before Dr. Miles had any symptoms. While the Court may apply such a con-

structive delivery theory under certain circumstances, *see New York Life Insurance Co. v. Babcock*, 104 Ga. 67, 30 S.E. 273 (1898), the Court declines to do so here. The conditions set forth in the Transamerica application expressly contemplate "personal receipt" by the policy "owner," not merely "delivery" of the policy. In light of this unambiguous language, the Court must enforce the policy as written. *See Ryan v. State Farm Mutual Automobile Insurance Co.*, 261 Ga. 869, 872, 413 S.E.2d 705 (1992).[6]

## B. Personal Receipt

Thus, to determine whether the second and third conditions precedent were satisfied, the Court must first determine when Dr. Miles personally received the policy. Mrs. Miles asserts that she picked up the policy from Dinerman on October 5, 1999; however, she has not specified when she gave the policy to Dr. Miles. Construing the facts and drawing all reasonable inferences in favor of Mrs. Miles, the Court assumes that Dr. Miles also personally received the policy on October 5. By this time, however, it is undisputed that Dr. Miles was no longer in good health, and the statements in his application were no longer true. Because two conditions of the application were not satisfied, Dr. Miles' September 13 policy with Transamerica never became effective. Therefore, Mrs. Miles' claim for an additional $1 million in death benefits fails as a matter of law.[7]

---

**6.** Mrs. Miles further asserts that Transamerica should be estopped from asserting the failure of the conditions precedent because Dinerman did not deliver the policy in a reasonable amount of time. Mrs. Miles contends that Dinerman, who received the policy in mid-September, should have delivered the policy by late September, before Dr. Miles became ill. The Court, however, has found no unreasonable delay. When Diner-

man notified Dr. and Mrs. Miles on September 13 that the application had been approved, he offered to deliver the policy to them. However, Mrs. Miles chose not to pick up the policy until they learned whether her application had been approved.

**7.** As Transamerica is entitled to summary judgment on this ground, it is unnecessary to address its remaining arguments.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [22] is GRANTED. Mrs. Miles' counterclaim is hereby DISMISSED. The Clerk is DIRECTED to terminate all pending submissions and to CLOSE this case.